Peter R. Afrasiabi (Bar No. 193336)
Email: pafrasiabi@onellp.com
John Tehranian (Bar No. 211616)
Email: jtehranian@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, CA 92660
Telephone: (949) 502-2870

Jonathan Ballard (Bar No. 327489)
Email: jballard@onellp.com
**ONE LLP**
9301 Wilshire Boulevard, Penthouse Suite
Beverly Hills, CA 90210
Telephone: (310) 866-5157

Les J Weinstein (Bar No. 36727)
Email: lesweinsteinadr@gmail.com
**LAW OFFICE OF LES J WEINSTEIN**
6417 Drexel Ave
Los Angeles, CA 90048-4705
Telephone: (310) 795-1923

Attorneys for Plaintiff,
DAVID LEW a/k/a SHARK TOOF

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DAVID LEW, an individual, a/k/a
SHARK TOOF,

        Plaintiff,

   v.

THE CITY OF LOS ANGELES, a
government entity; EL PUEBLO DE LOS
ANGELES, business form unknown;
CHINESE AMERICAN MUSEUM,
business form unknown; FRIENDS OF
THE CHINESE AMERICAN MUSEUM,
INC., a California corporation; and DOES
1 through 30, inclusive,

        Defendants.

Case No. 2:20-cv-10948-DDP-PLA
Hon. Dean D. Pregerson

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS CITY OF LOS
ANGELES AND FRIENDS OF THE
CHINESE AMERICAN MUSEUM'S
JOINT MOTION TO DISMISS**

Date:     March 1, 2021
Time:    10:00 a.m.
Crtrm:   9C

# **TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ........................................................ 1

    A.    The Pleading........................................................................ 1

    B.    Other Facts If the Court Requires an Amendment ................. 2

II.    VARA CLAIMS DO NOT HAVE A REGISTRATION
    REQUIREMENT ..................................................................... 5

III.    LEW'S ART IS NOT APPLIED ART ...................................... 6

    A.    VARA's Scope.................................................................... 6

        1.    Statutory Language ................................................... 7

        2.    Defendants' Case Law is Inapposite............................. 8

        3.    Plaintiff's Work Constitutes a Work of Visual Art .................... 12

IV.    LEW'S LIMITED-EDITION ARTWORKS ARE NOT MERE
    MERCHANDISING ITEMS ...................................................... 15

V.    CAPA IS NOT PREEMPTED ...................................................... 17

VI.    CAPA APPLIES........................................................................ 19

VII.    THERE IS NO TIME BAR ON THE STATE CLAIMS ................ 21

VIII.    THE CITY CAN BE LIABLE FOR CONVERSION AND
    NEGLIGENCE (FCAM DOES NOT MOVE ON THIS GROUND) ............ 22

IX.    THE UNFAIR COMPETITION CLAIM STANDS ...................... 24

X.    AMENDMENT ........................................................................ 25

XI.    CONCLUSION ........................................................................ 25

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Berrios Nogueras v. Home Depot*,
    330 F. Supp. 2d 48 (D.P.R. 2004) .................................................. 16

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) ...................................................................... 15

*Carter v. Helmsley-Spear, Inc.*,
    71 F.3d 77 (2d Cir. 1995) ....................................................... 10, 11

*Castillo v. G&M Realty L.P.*,
    950 F.3d 155 (2d Cir. 2020), *cert. denied* 141 S. Ct. 363 (Oct. 5,
    2020) ............................................................................................. 14

*Cheffins v. Stewart*,
    825 F.3d 588 (9th Cir. 2016) ...................................................... 8, 9

*Cohen v. G&M Realty LP*,
    320 F. Supp. 3d 421 (S.D.N.Y. 2018) ........................................ 14

*Cohen v. G&M Realty LP*,
    988 F. Supp. 2d 212 (E.D.N.Y. 2013) ..................................... 5, 14

*Cort v. St. Paul Fire and Marine Ins. Companies, Inc.*,
    311 F.3d 979 (9th Cir. 2002) ..................................................... 6, 18

*Diamond View v. Herz*,
    180 Cal. App. 3d 612 (1986) ....................................................... 20

*Laws v. Sony Music Entertainment, Inc.*,
    448 F.3d 1134 (9th Cir. 2006) ..................................................... 17

*Leider v. Lewis*,
    2 Cal.5th 1121 (2017) .................................................................. 24

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
    292 F. Supp. 2d 535 (S.D.N.Y. 2003) ........................................ 10

*Mateos-Sandoval v. County of Sonoma*,
    942 F. Supp. 2d 890 (N.D. Cal. 2013) ........................................ 20

ii

*Notrica v. State Compensation Insurance Fund*,
   70 Cal. App. 4th 911 (1999) ........................................................................ 24

*People v. Burgio*,
   16 Cal. App. 4th 769 (1993) ........................................................................ 20

*Pollara v. Seymour*,
   344 F.3d 265 (2d Cir. 2003) .......................................................................... 9

*Star Athletica, LLC v. Varsity Brands, Inc.*,
   580 U.S. ___, 137 S.Ct. 1002 (2017) ........................................................ 11

*Trailer Train Co. v. State Bd. of Equalization*,
   697 F.2d 860 (9th Cir. 1983) ...................................................................... 20

*Twitchell v. W. Coast Gen. Corp.*,
   No. 06-CV-4857 (C.D. Cal. Feb. 8, 2008) ................................................ 18

*Whalen v. United Food & Commer. Workers Local 135*,
   No. 14-CV-3017 W, 2015 U.S. Dist. LEXIS 102818 (S.D. Cal.
   Aug. 5, 2015) ............................................................................................. 18

*Wilson v. New Palace Casino, L.L.C.*,
   2013 U.S. Dist. LEXIS 31293 (S.D. Miss. Mar. 7, 2013) ........................ 16

**Statutes**

17 U.S.C. § 101 ................................................................... 7, 15, 16, 18

17 U.S.C. § 106 ................................................................................. 5, 6

17 U.S.C. § 106A ............................................................................ 6, 18

17 U.S.C. § 106A(a) ......................................................................... 5, 6

17 U.S.C. § 106A(a)(3)(A) ............................................................. 6, 17

17 U.S.C. § 106A(a)(3)(B) ............................................................. 6, 17

17 U.S.C. § 106A(b) ............................................................................. 7

17 U.S.C. § 411(a) ................................................................................. 5

Cal. Bus. & Prof. Code § 17200 ................................................... 24, 25

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

Cal. Civil Code § 14 .................................................................................. 20, 21

Cal. Civil Code § 987 ........................................................................ 20, 21, 24

Cal. Civil Code § 987(a) .................................................................................. 19

Cal. Civil Code § 987(b)(2) ............................................................................ 18

Cal. Civil Code § 987(b)(3) ..................................................................... 20, 21

Cal. Civil Code § 987(c)(1) ............................................................................ 21

Cal. Civil Code § 987(e)(2) ............................................................................ 17

Cal. Civil Code § 987(e)(3) ............................................................................ 17

Cal. Civil Code § 1714 ................................................................................... 23

Cal. Gov't Code § 815 .................................................................................... 23

Cal. Gov't Code § 815(a) ............................................................................... 22

Cal. Gov't Code § 815.2 .......................................................................... 23, 24

**Rules**

Fed. R. Civ. P. 12 ..................................................................................... 13, 22

**Other Authorities**

H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21, reprinted in 1990
      U.S. Code Cong. & Admin. News 6915, 6931 ................................... 6, 18

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   FACTUAL BACKGROUND

### A.   The Pleading

Plaintiff Lew (hereafter "Lew" or "Plaintiff") is a Chinese American renowned international artist known as "Shark Toof" whose paintings and outdoor murals are featured in museums, art shows, and with his collectors across the country (Complaint ¶ 3, 11, 14). Lew's art already exists in the Chinese American Museum's (CAM) permanent collection. (¶ 14). CAM is a City-owned art museum that specifically represents and celebrates the "history, rich cultural legacy, and continued contributions of Chinese Americans." (¶ 18.)

In 2018, the CAM began an art exhibit entitled "Don't Believe the Hype: LA Asian Americans in Hip Hop," which examined resistance, refuge, and reinvention for Asian Americans living in the Los Angeles region through art, and had site-specific immersive spaces created by graffiti artists and muralists. (¶ 13.)

For this art show, Lew was invited to be one of several prominent artists to showcase his art. (¶ 14.) Lew settled upon 88 original works of art, placed on red tote bags as an art medium, which were to be hung in the CAM courtyard on clotheslines as performative art that echoed the experience of Chinese Americans in Los Angeles and as a whole looked like a series of red lanterns. The exhibition of these 88 works was named by Lew, *Year of the Shark Red Packet*. (¶ 15).

Lew chose 88 specifically because the number 8 has special significance and meaning in Chinese culture. (¶ 15.) Defendants knew the art had meaning to Lew and the broader community. (¶ 18.) Lew created the 88 pieces of art, each individually touched by his hand in personalized pieces (as opposed to just printing 88 of the exact same art), hence all were original. (¶ 16.)

In 2018, his 88 original pieces were hung outside the CAM on lines evocative of laundry clothes lines echoing the Chinese experience in Los Angeles and entitled "Year of Shark Red Packet." (¶¶ 15-16.)

1

1    Without notice to Lew, the City in December 2018 sent trash crews which

2    removed and destroyed the art. (¶¶ 20-21.) After he was notified, Lew was contacted

3    by representatives of the Defendants, who expressed remorse and regret for their

4    destruction of Lew's art. (¶ 21.) Lew has never waived his VARA or CAPA rights.

5    (¶¶ 28, 33.) Lew filed a claim with the City, which refused to adjudicate the merits

6    of his claim (despite conceding fault, ¶ 21) and instead told Lew that, since FCAM

7    had insurance coverage, he should look to that policy for compensation. (¶ 23.)

8    Later, CAM and FCAM refused to compensate adequately Lew as they indicated

9    there was no insurance after all. (¶ 23.) This action followed.

10    **B.    Other Facts If the Court Requires an Amendment**

11    Defendants' Request for Judicial Notice ("RJN") is improper and objected to

12    separately. But because Defendants have lodged voluminous materials outside the

13    pleadings and have made insulting assertions about Lew's art, it is potentially

14    important for the Court to know other facts that exist that demonstrate the

15    Defendants' own subjective impropriety in their motion's attack on the artistic

16    integrity of Lew or his work. Before litigation, Defendant FCAM was moved by

17    Lew's art; but now in front of this Court, its lawyers press the argument his work is

18    mere functional shopping bag, a legal argument that is at complete odds with their

19    own clients' statements at the time it mattered. Thus, we note the following as

20    relevant to any amended pleading if desired as requested in § X *infra*:

21    1.    After Lew was already creating his art for the show, he offered to sell

22    the art for $88 in a symbolic act for the community and his collectors as a unique

23    limited edition.  This price was below the cost of goods and below the art's value,

24    and was done for the museum and his collectors, not as a reflection of the fair

25    market value that his art typically commands. The Defendants loved the idea and

26    told him to quickly agree to do so. (Thus, it was never the case that he had been

27    commissioned to create these merchandising items for the Defendants). No such

28    executed and delivered contract was in fact sent to plaintiff.

2

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

2.      Under Defendants' narrative, if they have a contract for 20% (as they claim but which is disputed) and they paid $1800 in material costs to Lew, they would never have recouped the costs even if they sold all 88 works. That is not the behavior of one selling commercial shopping bag merchandise, and it just proves that this was not a merchandising relationship for functional bags.

3.      Some of Lew's collectors had already sought and pre-purchased the art and were also upset when the works were destroyed, leaving Lew to have to make amends to his own collectors who now were being rebuffed in their anticipated purchase of his art. Those collectors buying his art were not buying tote bags or utilitarian objects and were excited to own a piece of Lew's unique art.

4.      In discussions about selling the art through the museum, the Defendants referred, in writing (May 4, 2018), to Lew's works as his art.

5.      The weathered alterations to each bag was to be art and part of the aesthetic uniqueness to each bag.

6.      Lew personally added artistic embellishments to each of the 88 pieces by his own artistic hand so that no two works are completely identical. (Hence each is original as alleged in ¶ 16).

7.      On October 30, 2018, in writing, Defendants alerted Lew that they took some of the art down as a precaution to protect it against some inclement weather. In so doing, and in writing, they said: "Also, we are going to extend the show until early/Mid December. Kim will be in touch for the paperwork for your loans regarding your work. *I've had such a pleasure watching your work daily at the museum. It's really gorgeous and inspired work. The shark painting especially is a great way to be welcomed to the office every day*." It is worth noting that functional shopping bags never elicit such emotional reactions, of course.

8.      Defendants thanked Lew in writing for showcasing his art, stating "Your work is a vital part of the community and we are honored to be able to share your work with the public…featuring site-specific murals as immersive

3

environments as well as paintings, photographs, audio/video installations and historical ephemera from artists including B+, Jason Chu, Defer, Gajin Fujita, Hueman, Kenny Kong, Nisha Sethi, Farah Sosa, SETI X, Shark Toof, Swank One, Erin Yoshi, DJ Rhettmatic, DJ Babu, Culture Shock Los Angeles, Fire Cracker, and the Beat Junkie Institute of Sound."

9.     The City's own claim investigator (Rick Rojas) expressly said to counsel for Lew that the City was not addressing his claim on the merits because there was FCAM insurance coverage for Lew to get compensation from the museum, thus the City did not need to adjudicate it; the City then never addressed it on the merits, and indeed even in the meet and confer on this motion when pressed about the alleged denial and why it was denied, defense counsel resorted to nothing more than saying it was denied, but even themselves could not explain why it was denied and refused to answer the "why" question despite repeat requests (proving it never was denied on the merits as the employees said at the time, as will be confirmed in depositions of the city personnel and Lew's counsel if necessary).

10.     The Vendor Agreement and required acceptance letter referred to in it at paragraphs 1c was not signed by FCAM nor was the letter nor the Vendor Agreement sent to Lew. Hence, the agreement never came into effect.

11.     FCAM induced plaintiff to not file against the City within the six-month period by falsely telling the Plaintiff and the City that it had ample insurance coverage and hence that the City need not concern itself with the claim. Based upon this negligent or fraudulent representation upon which the City apparently relied, the City rejected the Plaintiff's claim without considering it on the merits. It later turned out that the claimed insurance policy did not exist. Plaintiff also relied upon FCAM's representation and negotiated with FCAM and its purported insurer when the 6-month period passed. (VARA is not subject to the 6-month issue).

12.     FCAM began seeking to cover its error in not having insurance it was required by the City to possess, after Plaintiffs' work was destroyed. It told the

4

insurance company that the loss occurred after the effective date of the insurance policy it after-the-fact secured when in fact it occurred before. Also contrary to its contractual obligations to the City, FCAM did not maintain insurance covering exhibitor's work. It dishonestly claimed insurance included the work of exhibitors to plaintiff and the City. Defendant FCAM has been unwilling to explain its seeming fraudulent conduct with regard to insurance. Plaintiff will allege that when he sought reconsideration by the City of its denial, the Senior Claim's Investigator for the City encouraged Plaintiff to file suit against the City if Plaintiff wished to seek more than $50,000, as his authority to settle in the absence of a pending suit was limited to that sum.

## II.    VARA CLAIMS DO NOT HAVE A REGISTRATION REQUIREMENT

Defendants contend (§B.2) the VARA claims fail for lack of a copyright certificate. Not so, because VARA claims, unlike copyright infringement claims, do not require a copyright certificate.[1] The statute expressly makes clear that registration is required for claims *except* for VARA ones. *See* 17 U.S.C. § 411(a) ("Except for an action brought for a violation of the rights of the author under section 106A(a)…"); 17 U.S.C. § 106A(a) (VARA rights of attribution and integrity); *Cohen v. G&M Realty LP*, 988 F. Supp. 2d 212, 216 (E.D.N.Y. 2013) (copyright registration not required for VARA).

Although VARA claims emanate from Title 17, relate to certain original works of authorship (specifically those in the visual arts), and allow for the same statutory damages/fees remedies that traditional copyright law provides, VARA claims (which are grounded in 17 U.S.C. § 106A(a)) are fundamentally different than copyright infringement claims (which are grounded in 17 U.S.C. § 106) and, contrary to Defendants' motion, the two very distinct claims should not be

---

[1] In any event, Lew does have a registration certificate to which it can cite if so required.

conflated. While copyright's § 106 protects certain transferable and devisable (economically-based) exclusive rights secured for copyright holders (whether they are the author of a given work or not), Section 106A protects certain non-transferable and non-devisable moral rights that authors of a certain category of works—those in the visual arts—possess during their lifetimes.  By the express language of the statute, these particular moral rights (specifically, the rights of integrity and attribution) are, as a matter of law, entirely "independent of the exclusive rights of section 106." 17 U.S.C. § 106A(a). That is, copyright protects distinct economic rights such as reproduction, derivative works, display and the like and these rights are freely transferable when, for instance, an author sells her copyrighted work to a company. By sharp contrast, VARA protects a unique set of *authorial* rights, specifically the right of authorial attribution, the right to prevent distortion or mutilation of one's work and the right to prevent destruction of one's work. 17 U.S.C. § 106A(a). These non-transferable rights are referred to as the artist's "moral rights," and include the right of "integrity" and "attribution" and freedom from destruction. *Cort v. St. Paul Fire and Marine Ins. Companies, Inc.,* 311 F.3d 979, 984 (9th Cir. 2002) (citing H.R. Rep. No. 101-514, at 5 (1990)).

Ultimately, Defendants' error on the difference between a VARA and copyright action permeates their entire analysis. After all, if you depart from the wrong airline gate, then you get to the wrong destination too. Thus, Defendants next contend, centrally, that, as a matter of law, Lew's art is not worthy of VARA (or CAPA) protection (§ B.1) and that VARA preempts CAPA (§ D.1). But as with their registration argument, these assertions contradict binding black letter law.

## III.   <u>LEW'S ART IS NOT APPLIED ART</u>

### A.   Brief VARA's Scope

Under VARA, an author of a work of visual art has a series of moral rights, specifically at issue here the right to prevent the mutilation and/or destruction of the work. 17 U.S.C. § 106A(a)(3)(A) & (B). These rights, distinct to his property rights,

belong to the author of the work. *Id.* § (b). Under Section 101 of Title 17 a "work of visual art" is defined to include "a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author." It excludes "(A)(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication; (ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container." 17 U.S.C. § 101.

Without addressing the whole statute quoted here, which demarks the line between protected works of visual art and unprotected ones, Defendants telescope in on the phrases "applied art" and "merchandising items" and, divorced from their context, contend that Lew's art is simply applied art or a merchandising item because his art—individualized to each bag, no less, and issued in limited run of 88 all created by a visual artist (not an applied artist) and created for an art show (not an applied or craft show) at the request of an art museum (not an applied art museum) for him to showcase his art (not applied art)—was placed on tote bags. (§ A.1, at p. 8:10-16). Defendants' argument fails under the statutory language itself and also fails under the very cases it offers to support its contentions.

### 1.     Statutory Language

First, "applied art" is defined as artform outside the realm of works of visual art which are defined as paintings, drawings or prints. This is critical (and ignored by Defendants) because Lew's work is, as pled, exactly the central definition of a work of visual art: painting, drawing and print. Thus, at the very first level of analysis, Lew's work is a work of visual art.

Second, the exemption from those protected works (paintings, drawings and

7

prints) is a series of non-unique functional works—posters, maps, charts, technical drawings, diagrams, models, and applied art—or digital works of ubiquitous display (movies). "Applied art" is defined along with entirely utilitarian objects like diagrams, models, maps, and globes—things that are not deemed works of visual arts even if the technical diagram is a "drawing" for example. Defendants' arguments suffer from an interpretive error that divorces the concept of "applied art" from its sterile, functional statutory brethren. Properly understood then, it is obvious that Lew's highly stylized, limited edition works are not the types of functional works akin to globes, technical drawings, or applied art that VARA seeks to exclude from protection. To wit, as depicted in the Complaint at ¶ 16, Plaintiff's 88 works were 88 different versions of Plaintiff's distinctive and stylized depiction of a sharped-tooth shark with jaw agape and Chinese Hanzi symbols that would age uniquely and grow and transform during the course of the exhibit as they hung in the open air and became exposed to the elements and the sun. While Plaintiff's art may be featured on 88 tote bags, his work is not a tote bag. Rather, it is a unique and artistic depiction of a shark and Chinese Hanzi that happens to be featured on a limited series of tote bags, which served as the 'canvas' for the works.  His works, as alleged, are therefore a statutory work of visual art protected under VARA and cannot simply be labeled, as a matter of law no less, mere applied art.

### 2.    Defendants' Case Law is Inapposite

For these reasons, Defendants' three cases, when analyzed as applied to the facts of those cases as opposed to Defendants' selected quotes entirely divorced from the actual facts of the cases, are inapposite.

Indeed, *Cheffins v. Stewart*, 825 F.3d 588 (9th Cir. 2016), is instructive on Defendants' flawed approach and mandates denial of their motion. There, plaintiff took a school bus—a decidedly utilitarian object—and turned it into what looked like a 16th century Spanish galleon for continued busing and transportation use at a festival—still a utilitarian use post-artistic imprimatur.

8

*Cheffins* first adopted the very analysis offered here (and ignored by Defendants): statutory interpretation to demark the line between works of visual art and applied art. *Id*. at 593-94. As such, the Court held that "the focus of our inquiry should be on whether the object in question originally was—and continues to be—utilitarian in nature." *Id.* at 593. Not only was this test driven by the basic statutory definitions, the Court also held it comports with a plain reading of the relevant language and the application of common sense: "The fact that the other items in the list are utilitarian objects leads us to conclude that the listed items are related by their practical purposes and utilitarian functions, requiring a focus on utility when construing the term 'applied art.'" *Id.*

Importantly, *Cheffins* adopted this rule by following the Second Circuit in *Pollara v. Seymour*, 344 F.3d 265, 269 (2d Cir. 2003), which held that "VARA may protect a sculpture that looks like a piece of furniture, but it does not protect a piece of utilitarian furniture, whether or not it could arguably be called a sculpture." *Id.* at 269-71 (holding that elaborate painted banner advertising legal services was not a "work of visual art" because its primary purpose, regardless of how visually appealing it may be, was to promote and advertise).

Applying this rule, then, the Ninth Circuit in *Cheffins* held that the bus, even if it was adorned to look like a Spanish galleon with some artistic flair, remained a bus for transportation as that was how it was in fact used once it was so decorated: "Under the definition we adopt today, the *La Contessa* plainly was 'applied art.' It began as a rudimentary utilitarian object, and despite being visually transformed through elaborate artistry, it ***continued to serve a significant utilitarian function*** upon its completion." *Id.* at 595 (emphasis added).

Thus, while the *Cheffins'* Spanish Galleon Bus and *Pollara's* legal advertising banner were applied art ineligible for VARA, Lew's work is squarely pled (and exists) on the other side of that line. There is no evidence, let alone a pleading from which a Court can conclude, that the bag remained simply a bag intended and

9

designed to carry items in some functional manner, but just looking better (as in *Chaffins*), after Lew transformed the bag with his art. Nor was the bag simply offered, even if appealingly, as some form of artist promotional advertising material as in the *Pollara* case. To the contrary, Lew's art was not some tote bag that continued to serve a "significant utilitarian purpose" (as a matter of law no less as Defendants urge and which this Court would have to adopt to grant the motion); rather, it served only the purpose of constituting an exhibited art work at a prestigious museum and, when it was sold, it was to be sold as art to art collectors in a limited edition and was priced as such, not as a grocery bag. *See also* RJN Exh. 5 at 0.47 final ¶ (Lew stating that the art had pre-sold to collectors already)

Finally, *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co*., 292 F. Supp. 2d 535 (S.D.N.Y. 2003), does not support Defendants' position. There, the Southern District of New York confronted a dragon print put on pants (called "Snopants") sold on a massive scale at myriad retail outlets. *Id.* at 539. Defendant began selling infringing pants with a similar design. Plaintiff sued for trademark and trade dress infringement under the Lanham Act (which by definition required a showing of consumer identification of the design as designating a specific source for the product), copyright claims, and a VARA claim. As to the VARA claim over the dragon print, it did not qualify because it was ***not*** limited to an edition of 200 or less as expressly required by the statute. *Id.* at 554. Here, of course Lew's work was limited to 88. The rejection had ***nothing*** to do with the idea that the dragon design once placed on utilitarian fashion made it so utilitarian that it lost protection. As such, Defendants' use of the case is misleading, at best.

Other case law supports denying the motion. For example, in *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995), the Second Circuit held that a sculpture constructed of portions of a school bus and affixed to a wall in a building lobby was not "applied art." It explained that the term "applied art" means "two-and three-dimensional ornamentation or decoration that is affixed to otherwise utilitarian

objects." *Id.* at 84-85 (internal quotation marks omitted). The court further explained that the sculpture was not "applied art" simply because it was affixed to "the lobby's floor, walls, and ceiling" because "[i]nterpreting applied art to include such works would render meaningless VARA's protection for works of visual art installed in buildings." *Id.* at 85. The same is true here: just because the art was affixed to a bag (that like a wall can be defined as a utilitarian object) renders meaningless VARA's protections for works of art painted or drawn on any utilitarian object.

Most significantly, Defendants' motion wholly ignores the binding authority of the Supreme Court's recent decision in *Star Athletica, LLC v. Varsity Brands, Inc.*, 580 U.S. ___, 137 S.Ct. 1002 (2017). All three of the cases (mis)cited by Defendants predate this decision and, therefore, to the extent that they clash with its holding and rationale, they have been overruled. In *Star Athletica*, the Supreme determined that aesthetic features of "useful articles" can receive protection under Title 17 as pictorial, graphic or sculptural works when said features "(1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic or sculptural work either on its own or in some other medium if imagined separately from the useful article." *Id.* at 1016. Thus, the Court held that certain graphical chevrons, stipes and zigzags constituted works of art protected under Title 17 despite the fact that they appeared on functional cheerleading outfits. *Id.* Under this test, Lew's unique and artistic depiction of a shark can clearly be imagined separately from the tote bag on which is it found and it would qualify as a pictorial or graphic work if it were found on, say, a more traditional canvas. If chevrons, stripes and zigzags on a cheerleading outfit are recognized as protected graphical works of art, then, as a matter of law, so must Lew's limited edition and unique shark depictions on tote bags.

Ultimately, therefore, Defendants err in selectively quoting from cases divorced from their context. Properly read, the cases confirm that Lew's art is not a mere utilitarian object. And, Defendants ignore the binding authority of the Supreme

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

1   Court on the issue, which render Lew's works indisputably protected as works of

2   visual art under VARA. Here, the bag was the very canvas that Lew applied his art

3   to, just as other artists apply their art to a variety of tangible media. Banksy receives

4   no less protection for his art because it happens to be placed on building walls that

5   function to separate the inside from the outside and protect individuals from the

6   elements. Christo and Jeanne-Claude receive no less protection for their installation,

7   *The Gates*, because it is placed literally on the grounds of a functional park (*i.e.*,

8   Central Park). And David Lew should receive no less protection for his distinctive

9   rendering of a shark because it happens to be placed on a bag. The bag, once

10  transformed by the art, no longer continued to serve significantly utilitarian purposes

11  or objectives. The Court cannot conclude as a matter of law that Lew's work is

12  applied art outside VARA protection.

### 3.   Plaintiff's Work Constitutes a Work of Visual Art

14        Here, the facts must be taken as true in Plaintiff's favor and thus, given the

15  facts alleged, the creations are a work of visual art and not applied art. The very

16  museum where Lew's art was hung—at the request of the *art* museum—is an *art*

17  museum. The works were part of a larger cultural *art* showcase for the public to

18  celebrate the Chinese community through its community own artists, of which Lew

19  is one (and indeed was asked before to showcase his art there). They were not part

20  of an applied art or craft showcase, nor were they hung simply to showcase a new

21  functional tote bag to the Los Angeles Chinese community as Defendants implicitly

22  would have this court conclude.

23        First, the contention that the art loses protection because it was applied to a

24  bag is wrong (not to mention demeaning). Lew chose to have 88 pieces in his art

25  exhibit for a reason—the significance of the number 88 to the Chinese community.

26  He also chose to display his art in this public performance manner to echo the

27  experience of Chinese Americans in Los Angeles—the use of clothes lines and

28  laundry clips hanging the art was reminiscent of Chinese laundry facilities that are

1  part of the historical Chinese-American experience in the laundry trade including

2  Lew's family and the red color was to symbolize Chinese lanterns. And all 88 were

3  then to be weathered in individualized unique ways as they hung during the

4  performative art show so that each was an individualized version of the same motif,

5  again like the experience of Chinese Americans where despite similar experiences

6  no two are truly identical (unlike applied art where each bag off the conveyor belt is

7  a facsimile of the prior and subsequent one). Thus, the assertion that it is just a bag

8  with a picture and some Chinese writing tossed on it, as if this were some sort of

9  Trader Joe's grocery bag, is both wrong and offensive.  Similarly, the assertion that

10  the art was really just a utilitarian functional bag is both incorrect and here factually

11  disputed.

12      Second, a utilitarian Trader Joe's (or Ralphs, Vons, etc.) grocery bag (with a

13  picture on it) or some other bag with a picture on it (like a JanSport backpack for

14  example) is not limited to a production run of 88, nor publicly displayed and offered

15  as *art* through an *art* museum for $88.00. A utilitarian tote "bag" costs 88 cents

16  maybe, not 100 times that. The sale price Defendants reference demonstrates that

17  this was being sold as *art*, not as a bag to serve utilitarian functions.

18      Related, while the Court cannot now consider Defendants' disputed factual

19  materials at Rule 12, the materials nevertheless themselves show Lew's creations

20  were perceived, understood and being sold as art, not as a utilitarian object; and

21  show they were offered and advertised as art, not as a utilitarian bag—that alone

22  proves the utilitarian nature of the bag ceased to exist as the bag became a

23  collector's piece of art.

24      Third, and critically, just because the art was placed on a tote bag does not

25  make it unqualified applied art. All art is applied to a utilitarian substance after all—

26  Monet's paint touched a piece of canvas where canvas it a utilitarian object to wrap

27  goods; Ansel Adams' photos touched celluloid film; and, of particular analogous

28  import, street art (routinely protected by VARA no less) is painted on concrete and

13

metal building walls and bridges—walls and bridges being the very epitome of a utilitarian, functional object/device. And when Picasso, as he famously did, drew a few lines on a napkin and gave it to his lunch guest, that napkin ceased being a napkin and became a piece of art.

To be sure, the recent VARA cases involving street art are particularly important to consider for under Defendants' theory there is no VARA claim whatsoever in all range of public art (like Lew's) simply because the object the art is applied to—a wall—continues to perform entirely utilitarian functions. For example, in the recent "5Pointz" case, graffiti art applied to building walls was protected by VARA (and subjected to a $6,750,000 statutory damages award). *Cohen v. G&M Realty LP,* 320 F. Supp. 3d 421, 427-28 (S.D.N.Y. 2018); *see also Cohen v. G&M Realty LP*, 988 F. Supp. 2d 212, 214-220 (E.D.N.Y. 2013) (graffiti art on building wall protected). And the Second Circuit affirmed the existence of this VARA claim in art on walls and the $6,750,000 in statutory damages. *Castillo v. G&M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020), *cert. denied* 141 S. Ct. 363 (Oct. 5, 2020). VARA provides for optional statutory damages ranging from $750 to $30,000 per item destroyed (and $150,000 in exceptional cases as in "5Pointz") to protect artists.

Thus, the contention that this art as a matter of law is no more than a pure utilitarian object—not art, but just a bag that happens to have a picture on it—cannot be sustained on this record as a matter of law; at best, it is a fact question that Defendants can try to push on a jury in their bid to convince a jury that the bags were not art, did not function as art in the art show, and were really just still utilitarian bags being bought by art collectors who really wanted a utilitarian bag.

Fourth, the Supreme Court over a century ago laid down one of the most basic precepts of law as applied to judges looking to make merit-based artistic determinations about an artist's work. In short, they should not do it:

> It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits. At the

14

one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke. It may be more than doubted, for instance, whether the etchings of Goya or the paintings of Manet would have been sure of protection when seen for the first time. At the other end, copyright would be denied to pictures which appealed to a public less educated than the judge.

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903).

As the Supreme Court has exhorted, judges can make the legal determination that one's art is not really art in only the most extraordinary and rarest of cases. This Court should decline the Defendants' invitation to conclude, as a matter of law no less, that Lew's works of visual artistic creations—sought for an art show, displayed at an art show, and then to be sold as unique pieces of art to his collectors and offered to museum patrons—must instead be deemed a functional, utilitarian object that does not constitute art. Such a conclusion is exactly the improper kind of aesthetic judgment that *Bleistein* forbade.

Finally, the question of whether the 88 unique works at issue in this case ceased to be art and were really utilitarian is, at best, a factual question. On this record, as pled and as demonstrated above, the bags ceased serving any utilitarian function/master when they became one-of-a-kind rare art (limited to 88 unique individualized creation) and, to the extent there was any theoretical utilitarian function in the tote bag before Lew had them and applied his artistry to them was lost when he transformed them into art in an art exhibit to be sold to collectors. His collectors sought to buy them to hold a unique piece of art, not a utilitarian object.

## IV.   LEW'S LIMITED-EDITION ARTWORKS ARE NOT MERE MERCHANDISING ITEMS

Defendants also contend, as a spin on their applied art argument, that Lew's art is a mere "merchandising item" under § 101. Not so again. First, Defendants' argument hinges on extra-pleading material and so must be denied on that basis alone. *See generally* Objections to RJN, filed concurrently herewith.

Second, the RJN material does not support what Defendants contend and so is

15

disputed material anyway. Specifically, Lew's art was being sold as limited-edition (to only 88) collectible art to the museum patrons or his collectors, indeed as unique pieces where each of the 88 were different both due to his applied artist's hand to each bag but also due to the weathering of the bags. The mere fact that it was offered for sale at a museum gift shop does not ipso facto make it a "merchandising item." Those types of items are advertising and promotional materials, as defined in § 101. But there is nothing on the face of this Complaint that lets the Court conclude Lew's art was being sold as merchandising, promotional or advertising material. Quite the contrary: it was limited edition art and Lew already had collectors who had pre-paid to have the pieces and then were angered when they could not get them. (RJN Exh. 5, p. 47, last paragraph.)

Moreover, there is no case law that supports the idea that where there is limited edition art created for an art show by an artist showing at the art museum— just because it is then sold at the museum the art is suddenly an unprotected "merchandising item." Rather, the law makes clear that "merchandising items" are advertising and promotional items, such as the Wahoo's blue logo for its fish taco restaurant used to sell and advertise commercial services. *See Wilson v. New Palace Casino, L.L.C.,* 2013 U.S. Dist. LEXIS 31293, *15-17 (S.D. Miss. Mar. 7, 2013); *see also Berrios Nogueras v. Home Depot,* 330 F. Supp. 2d 48, 51 (D.P.R. 2004) ("it is clear that VARA does not afford a right of action to plaintiff for the unauthorized reproduction of his work upon the 'posters' or 'shoppers' i.e. 'advertising or promotional material' that were printed or published by defendants in their stores").

Framed differently, how often do art museums hang their merchandising items in an art exhibition for the public to come attend an art gala celebrating merchandising items and then sell only 88 such advertising items? Defendants' argument is not only wrong, but defies Defendants' own prior conduct—which celebrated, as an exhibit of art by a noted artist invited to showcase his art, the very thing they are now dismissing as mere merchandising. As such, it should not be

16

surprising that Defendants' interpretation of VARA would make a mockery of the statute's language limiting protection for merchandise.

Finally, it is flat false factually (and offensive to Lew as an artist) that Lew's works were "prepared under contract for commercial use by Defendants" as alleged in the Notice of Motion at 2:6, as demonstrated herein and in the Complaint. To wit, again: Lew was asked to showcase his art; he created art for an art show; his art was noted as moving by the Defendants; he offered to sell it for collectors at $88.00 as a symbolic gesture to help his collectors and the museum. He was never asked to prepare his art under a contract to prepare merchandising items.

## V.    **CAPA IS NOT PREEMPTED**

Defendants contend VARA preempts the CAPA claims (§ D.1). It does not for two independent reasons.

First, VARA protects rights of integrity and attribution only if the destruction is "prejudicial to his or her honor or reputation." 17 U.S.C. § 106A(a)(3)(A)&(B). It does not provide for non-reputation/honor economic damages. But CAPA instead does protect those distinct economic interests—the damage to the property itself—irrespective of any honor/reputation injury to the artist by instead providing actual damages for the intentional destruction that occurred, as well as punitive damages for such economic actual injuries. Cal. Civ. Code § 987(e)(2), (3). CAPA's extension of protection to destruction of art works whether or not the destruction is "prejudicial to [the artist's] honor or reputation" qualitatively distinguishes its claim from the more limited protection available under VARA.

Here, plaintiff is independently seeking actual damages for the art's destruction under CAPA irrespective of any damage to honor/reputation. *See* Complaint ¶ 34, Prayer ¶ 3 ("***property rights and*** damage to his reputation") (emphasis added), ¶ 5 (punitives). Accordingly, the state claim is outside the scope of VARA and so would fall outside the reach of any preemption under *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006) (preemption test

17

prong two), because the rights and damages asserted under the state law (property rights and damages therefrom) are not equivalent to the rights under federal law issue (reputation only).

Indeed, it is worth noting that Defendants' argument has already been rejected in a related context. For example, in *Whalen v. United Food & Commer. Workers Local 135*, No. 14-CV-3017 W, 2015 U.S. Dist. LEXIS 102818, *5 (S.D. Cal. Aug. 5, 2015), the court found VARA preempts state CAPA claims only where the state claim "is based solely on the alleged violation of artistic integrity" and thus the pleading there "as currently drafted" was preempted. Here, Lew's complaint pleads exactly as *Whalen* indicates is necessary to avoid preemption.

Second, VARA only applies to the narrow range of moral rights in the context of "works of visual art" that are not "applied art." 17 U.S.C. § 101, 106A. But CAPA protects a different and distinct body of works—specifically fine art irrespective of any additional applied art label that can be attached. Cal. Civ. Code § 987(b)(2). Indeed, this is the traditional economic formulation of rights in the United States that is the very antithesis of the moral rights regime from the Continent that VARA sought to narrowly adopt in the United States as a unique continental moral rights regime, *see generally Cort,* 311 F.3d at 984-85, thus further demonstrating that CAPA and VARA do not attach to equivalent rights on these facts at all.

Here, if a jury found the work to be applied art, then it would fall outside of VARA, but it could still be a work of fine art under CAPA eligible for protection for economic actual damages. Thus, these rights for fine art (even if applied art), too, are not equivalent to federal VARA ones, and so preemption does not follow for this additional reason. Indeed, the House Report regarding VARA stated expressly that VARA would "***not preempt State causes of action relating to work that are not covered by the law***." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21, reprinted in 1990 U.S. Code Cong. & Admin. News 6915, 6931 (emphasis added); *see also Twitchell v. W. Coast Gen. Corp.,* No. 06-CV-4857 (C.D. Cal. Feb. 8, 2008) (Judge

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**

Cooper) (finding state claims for negligence and conversion seeking damage for violation of one's rights as an owner of personal property, in distinction to the authorial/moral rights of integrity, not preempted by VARA).  Accordingly, as in *Twitchell* and *Whalen*, the CAPA claim as pled here is not preempted.

## VI.   CAPA APPLIES

### A.   The works are original paintings

Defendants contend that Lew's works are not "original paintings" (§ D.2 p. 11:5-8). Not so. Each bag's art was individually painted by Lew as a unique individualized version of each of the shark drawings by personal artistic touches of the artist. *See* Complaint ¶ 15 ("88 original"); *supra* § I.B. To be clear: all 88 bags were individually painted with individualized touch ups and flairs by the artist after applying the shark art; and then all 88 were weathered (per the express intention of the author) uniquely further. (Defendants also argue that the bags were simply merchandising items (§ D.2 p. 11:9-13). But as explained above, that is incorrect.)

### B.   The City is a "Person"

Defendants' main argument is that the City is not a "person." The sheer breadth of this claim is worth reflecting on: the City contends that it can destroy anyone's art at will—even art that the City invites to be housed and shown to the public on its property, as here—and face no CAPA exposure because it is not a "person." The City errs for several reasons.

First, not only is there nothing in CAPA's text or legislative history that sought to immunize cities from these claims, in fact the statute's language evinces the exact *opposite* tack and intent. Section 987(a) makes clear that the very purpose of the law is to protect artists against destruction of their art in part because there is "a *public* interest in preserving the integrity of cultural and artistic creations." Cal. Civ. Code § 987(a) (emphasis added). The idea peddled by Defendants—that California somehow enacted a statute to protect the *public* interest in the preservation of our culture through art, but someone excluded cities from its

19

application—is oxymoronic and injurious to all artists. After all, municipalities are representative of the public and our collective culture. Moreover, so much of our artistic heritage is found, as in this case, in ***public*** spaces on city/government land. It would defy all reasoning to view CAPA as somehow inapplicable to cities. Simply put, statutes cannot be interpreted to create such results antithetical to the very mission statement of the law. *See Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 865 (9th Cir. 1983) ("In interpreting a statute, the court's objective should be to ascertain congressional intent and give effect to legislative will."); *see also People v. Burgio*, 16 Cal. App. 4th 769, 776 (1993) ("A statute should be interpreted (1) in accord with the ascertained legislative intent so as to effectuate the purpose of the law" and "in a reasonable, commonsense, practical and nontechnical manner consistent with the legislative intent in order to effectuate wise policy rather than mischief or absurdity . . . .").

Second, Defendants' resort to Cal. Civil Code § 14 over Section 987 is wrong for a more fundamental reason, namely Section 987 defines a person ***differently*** to the general definition in Section 14. *Compare* Cal. Civ. Code § 987(b)(3) ("'Person' means an individual, partnership, corporation, limited liability company, association or other group, however organized."); *with* Cal. Civ. Code § 14 ("[T]he word person includes a corporation as well as a natural person . . . ."). Section 987(b)(3) has a far more expansive definition of "person" than Section 14 and as the specific statute at issue it governs over Section 14's general provisions. *See* Cal. Civ. Code § 14 (providing that the words defined in Section 14 "have . . .the signification attached to them in [Section 14] unless otherwise apparent from the context.") (emphasis added); *see also Diamond View v. Herz*, 180 Cal. App. 3d 612, 617 (1986) (recognizing the "universal imperative that general definitions of terms in the preliminary provisions of a code are necessarily qualified by the contextual usage of the word in other sections."); *and also Mateos-Sandoval v. County of Sonoma*, 942 F. Supp. 2d 890, 906 (N.D. Cal. 2013) ("In interpreting California statutes, federal

20

1  courts apply California rules of statutory construction."). Accordingly, Section

2  987(b)(3) is clear that "person" is all encompassing in its broadness: "individual,

3  partnership, corporation, limited liability company, association or other group,

4  however organized." That is, anyone who destroys art is ensnared as a "person" for

5  this statute as being one of those nouns or the catch-all term "association or group."

6  Defendants here are both municipal corporations and/or an association, or they are

7  another group of actors "however organized." (Indeed, RJN Exhs. 3 and 4, and the

8  Truong Decl., all make clear all defendants are corporations, whether municipal

9  ones or non-profit ones.) But even if the City is organized in some non-corporate

10 form technically, then it is captured by the catch-all language because, "however

11 organized," the City functions as a group or entity. Defendants inexplicably fail to

12 even mention this governing provision of Section 987.

13      Third, Defendants' textual parsing is also inapplicable here (even if § 987 did

14 not define "person" itself) because Section 14 defines a person to include

15 corporations (of whatever type) and the City is a municipal corporation. (RJN. Exh.

16 4 line 2). Thus, as a municipal corporation it is a Section 14 "corporation" anyway.

17      Fourth, Defendants' textual argument is tortured and creates nonsensical

18 counter-factuals. Section 987 states that no person shall destroy another's art as a

19 prescriptive statement. Cal. Civ. Code § 987(c)(1). If the City is correct that it is not

20 a person, then the statute would be saying that, even though a city destroys art, it did

21 not destroy it—as a prescriptive factual matter (as opposed to remedial liability not

22 attaching for a given act), and this makes no sense and turns the language into a

23 confused pretzel in a paradoxical wonderland universe (where the City destroyed the

24 art in fact but didn't destroy it because it can't destroy art; but it did).

25 **VII.   THERE IS NO TIME BAR ON THE STATE CLAIMS**

26      The City asserts an affirmative defense and contends that the state claims are

27 time barred because Lew filed this suit 18 months after the City's RJN Exhibit 6

28 document was purportedly sent (§ C). Lew will assert estoppel, waiver and

21

misrepresentation to that defense if pled by the City.

First, the Complaint does not evince that document. As such, reference to the document is a matter outside the pleadings that should not be entertained on a Rule 12 motion. Second, that procedural issue aside, judicial notice is not proper for materials relating to contested factual issues, which the City's alleged "decision" here expressly is. The Complaint addresses this clearly. (Complaint ¶ 23; *supra* § I.B; Objections to RJN, filed concurrently herewith.) In any event, enough of this is already referenced in the Complaint to make reliance on RJN Exh. 6 error as a matter of law as the Court would be adopting the document for the truth of it despite contrary pleaded facts that the City actually said it was not electing to even make a merits decision because FCAM had coverage.

Thus, under these facts, the City's Exhibit 6 is not in fact a denial on the merits triggering any 6-month deadline. That is, the Court cannot accept that document for the truth of the matter asserted, which is what ostensible judicial notice materials really comprise. Lew to this day has never been given any explanation for why the City—which admits it destroyed his art works—ostensibly does not even need to pay for the cost of each work. If Exhibit 6 were truly a merits-based decision, the City—which admitted fault (Complaint ¶ 21)—would have obviously offered some de minimis compensation, unless the City has an illegal practice of denying every claim regardless of merit. Instead, the document the City offers along with the facts that surrounded its transmission make clear the City never in fact (or indeed by intent) was denying the claim, and instead the City punted on assessing the issue given its perception of coverage from FCAM. The City's resort to this document, which is disputed as to what it may say on its face, especially in light of the Complaint's contrary facts, is improper at Rule 12.

## VIII. <u>THE CITY CAN BE LIABLE FOR CONVERSION AND NEGLIGENCE (FCAM DOES NOT MOVE ON THIS GROUND)</u>

The City parsimoniously contends that Section 815(a) immunizes it from suit

22

for negligence and conversion (§ E). But curiously, it fails to cite to this Court a code section a few pages later, Section 815.2. Under § 815.2 of the Government Code, public entities are indeed liable for injuries proximately caused by their employees within the scope of employment, whether or not they result from negligence or conversion. And the Complaint has expressly alleged that the injuries herein were caused by city officials conducting official city business under a contract with FCAM. (Complaint ¶ 20) And Doe Defendants have been named so that they may be added once the City identifies who exactly were their employee or agents sent to destroy the art. Either way, the City is liable for their acts: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Cal. Gov't. Code § 815.2. Accordingly, under § 815.2 the City is liable for its employees' conversion and negligence.

Even putting Section 815.2 aside, Section 815 is prefaced by "except as otherwise provided by statute" precisely because the common law doctrines that were subjected to immunity by a legislative act were also then limited by other positive acts of the legislature. Thus, the "except as otherwise provided by statute" language applies to statutory claims, such as CAPA (which Defendants do not even contend is subject to such sovereign immunity), and those statutory claims include, at issue here for example, statutory negligence under positive, statutory law as it has been enacted and exists in California (in distinction to ancient, judicially-created common law negligence) under Cal. Civil Code § 1714. *See* Cal. Civ. Code § 1714 ("*Everyone* is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.") (emphasis added); *id.* (expansively defining scope to everyone, period).

## IX.    THE UNFAIR COMPETITION CLAIM STANDS

The City claims it is not a person under Cal. Bus. & Prof. Code § 17200 and so cannot be asked to answer under § 17200 (§ F). This is incorrect, as there is no absolute bar to suing cities or governmental agencies under § 17200. Here, the City was engaged in providing art at *its* museum, through the FCAM that the City contracted with and demanded that have insurance for the express benefit of protecting the artists (as even its own RJN notes at Exh.4 § 8.3.B), and these artistic endeavors are not the types of traditional commercial activities that Defendants' cited cases involve. Instead, these are endeavors expressly covered by Section 987 which does apply to cities as addressed above.

Illustrative of this principle, and the absence of the per se rule advocated by the City, is *Notrica v. State Compensation Insurance Fund*, 70 Cal. App. 4th 911 (1999). There, the state court of appeal rejected the State Compensation Insurance Fund's ("SCIF") argument that as a public entity, it was not a "person" subject to suit under the UCL based upon the specific statutory provisions that governed SCIF's existence where the insurance code provided that SCIF may "[s]ue and be sued in all actions arising out of any act or omission in connection with its business or affairs." As in *Notrica*, this suit is addressing a narrow category of wrongs for which the City is expressly within the animated statute (§ 987) and certainly within the federal law; thus, the additional remedies of § 17200 should also attach, as in *Notrica*. *Notrica* was not expressly overruled by *Leider v. Lewis*, 2 Cal.5th 1121, 1132 n.9 (2017). Even if *Leider* is read to have done so in some fashion, employees do not enjoy such exemption (as above with the § 815.2 analysis) and so the claim should stand so that an injunction may be issued as against the correct people (and FCAM) to protect Lew and other similarly situated artists.

Finally, FCAM claims it also has no liability because it is a "non-profit, public benefit organization" (p. 12:22-24) asked by the City to run the museum. But being asked by the City to do something commercial does not make one a "City" for

24

purposes of the "person" definition. FCAM is not a governmental entity (and does not even offer evidence it is one) exempted from 17200's person definition. Indeed, the very RJN document offered by Defendants says that FCAM is, in fact, an arms-length separate entity and not an agent of the City, rendering the counterargument here facially false. (RJN Exh. 4 § 2.1A; Truong Decl.). And non-profits are still corporations, and indeed the RJN materials prove CAM/FCAM is a corporation (*see* RJN Exhs. 3-4 (noting FCAM is a corporation)) and are not governmental organizations simply because they are non-profit or working with a government. Instead, even if the City is exempted as not being a § 17200 "person," FCAM is a § 17200 person. And restitution and injunctive relief is both needed and warranted against it in order to ensure that finally it adopts proper policies and procedures to protect Lew and all artists it showcases in the future.

## X.   AMENDMENT

If the Court is inclined to grant any part of the motion, Plaintiff will amend to address any alleged factual deficiencies. *Supra* § I.B. But, critically, granting the motion on the basis of any of the RJN materials—all of which revolve around apparent affirmative defenses—and requiring Plaintiff to plead facts to as-yet unpled affirmative defenses should not be required of Plaintiff under any scenario.

## XI.   CONCLUSION

Defendants' motion should be denied. Indeed, it borders on frivolous in its attempt to make conclusive per se legal rulings based upon crimped quotes divorced from case holdings; it errs on basic black letter law; and it improperly seeks the Court to decide disputed fact questions via an improper RJN vehicle.

Dated:  February 22, 2021          **ONE LLP**

By: /s/ Peter R. Afrasiabi
    Peter R. Afrasiabi
    John Tehranian

25

Jonathan O. Ballard

*-and-*

**LAW OFFICE OF LES J WEINSTEIN**
Les J Weinstein

Attorneys for Plaintiff,
DAVID LEW a/k/a SHARK TOOF

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PLAINTIFF'S OPPOSITION TO DEFENDANTS CITY OF LOS ANGELES
AND FCAM'S MOTION TO DISMISS**