O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEW, an individual, a/k/a SHARK TOOF,<br><br>           Plaintiff,<br>  v.<br><br>THE CITY OF LOS ANGELES, a government entity; EL PUEBLO DE LOS ANGELES, business form unknown; CHINESE AMERICAN MUSEUM, business form unknown; FRIENDS OF THE CHINESE AMERICAN MUSEUM, INC., a California corporation; and DOES 1 through 30, inclusive,<br><br>           Defendants. | Case No.  20-cv-10948 DDP (PLAx)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>[Dkts. 19, 20, 21, 22] |

///

///

///

Presently before the court is Defendant the City of Los Angeles ("City") and Defendant Friends of the Chinese American Museum Inc. ("FCAM") (collectively, "Defendants")' Motion to Dismiss the Complaint.  (Dkts. 19, 20, 21, 22.)  Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following order.

**I. BACKGROUND**

David Lew ("Plaintiff") is "an internationally known professional artist and muralist of worldwide repute and reputation" also known as "Shark Toof."  (Dkt. 1, Compl. ¶ 11.)  Plaintiff's "paintings as well as his outdoor murals have been featured around the world and his original artwork has been sought by a diverse range of clients, as well as displayed at art shows in museums across the country."  (*Id.*)  Defendants are the City of Los Angeles ("City"), El Pueblo de Los Angeles ("El Pueblo"), the Chinese American Museum ("CAM"), and the Friends of the Chinese American Museum ("FCAM") (collective, "Defendants").  (*Id.* ¶¶ 4, 5, 6, 7.)  "In 2018, CAM began a multi-month exhibition called 'Don't Believe the Hype: LA Asian Americans in Hip Hop.'"  (*Id.* ¶ 13.)  Plaintiff alleges that the exhibition "examined resistance, refuge, and reinvention for Asian Americans living in the Los Angeles region through art and had site-specific immersive spaces created by graffiti artists and muralists."  (*Id.*)  CAM invited Plaintiff to showcase his original art at the exhibition along with other renowned artists.  (*Id.* ¶ 14.)  At the time Plaintiff was invited, "one of [Plaintiff's] works was already in CAM's permanent collection."  (*Id.*)

Plaintiff "created 88 original pieces of artwork to be shown at CAM's exhibition."  (*Id.* ¶ 15.)  Plaintiff "chose [to create] 88 [pieces] given the special reverence and meaning of the number eight in the Chinese Culture."  (*Id.*)  Plaintiff's "art creations were placed on tote bags, which were to be hung outside CAM on clotheslines as performative art that echoed the experience of Chinese Americans in Los Angeles and as a whole the

2

1  pieces looked like a series of red lanterns."  (*Id.*)  Plaintiff named the exhibition of his
2  artwork: Year of the Shark Red Packet.  (*Id.*)
3        "In December 2018, [Defendants] collectively removed the art without giving
4  notice to [Plaintiff]."  (*Id.* ¶ 17.)  According to Plaintiff, Defendants "sent trash removal
5  crews" to remove his art; "the trash crews proceeded to take down, discard, and destroy
6  the original art, and irretrievably and literally dumped the original pieces in the trash."
7  (*Id.* ¶ 20.)  Plaintiff alleges that Defendants ordered the removal without having
8  "qualified or authorized representatives to oversee and manage the art removal,
9  preservation, and protection process"—contrary to, as Plaintiff alleges— "a standard
10 practice in the art world."  (*Id.* ¶ 19.)  Plaintiff further alleges that Defendants knew that
11 Plaintiff's art "was deeply important to him and imbued with personal meaning . . .
12 [Defendants] were also profoundly aware of the meaning of the work to the broader
13 public, including the Chinese American Community."  (*Id.* ¶ 18.)  Plaintiff learned about
14 Defendant's removal and subsequent destruction of his work in late December 2018 and
15 expressed "horror and shock."  (*Id.* ¶ 20.)
16       Plaintiff alleges that the City's general manager Chris Espinosa through El Pueblo
17 "admitted fault after the art had been destroyed.  CAM's curator Justin Hoover also
18 admitted fault."  (*Id.* ¶ 21.)  Plaintiff alleges, however, that Defendants have not returned
19 any of Plaintiff's original pieces and have never formally apologized for "the destruction
20 of [Plaintiff's] work.  (*Id.* ¶ 22, 24.)  Plaintiff filed a "formal claim" with the City and "also
21 sought redress from CAM/FCAM and its purported insurance carrier."  (*Id.* ¶ 23.)
22 According to Plaintiff, the City, "[i]n bad faith, . . . failed to even address [Plaintiff's]
23 claim on its merits because it said CAM/FCAM had advised it that it had insurance, and
24 told [Plaintiff] to look to CAM/FCAM for relief."  (*Id.*)  Plaintiff alleges that "[a]fter being
25 advised by its insurance carrier that [Plaintiff's] claim was not covered, CAM/FCAM
26 dishonestly claimed that it had done nothing wrong and that Lew should look only to the
27 City for compensation."  (*Id.*)
28

Based on the allegations above, Plaintiff asserts the following federal and state causes of action against Defendants: (1) Violations of the Visual Artists Rights Act ("VARA") and Right of Integrity (17 U.S.C. § 106A); (2) Intentional Desecration of Fine Art (Cal. Civ. Code §§ 987(c)(1), (e)); (3) Grossly Negligent Desecration of Fine Art (Cal. Civ. Code §§ 987(c)(2), (e)); (4) Conversion; (5) Negligence; and (6) Unfair, Unlawful Practices (Cal. Bus. & Prof. Code § 17200 *et seq.*).

Presently, Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1). (Dkt. 20, Mot.)

## II. LEGAL STANDARD

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Id.* at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id.* at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555, 556. "Determining whether a complaint

4

states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**III. DISCUSSION**

    **A. Visual Artists Rights Act ("VARA")**

        **a. There is No Registration Requirement under VARA**

As an initial matter, Defendants argue that there is no subject matter jurisdiction because Plaintiff did not obtain a copyright registration prior to filing suit. (Mot. at 8-9.) According to Defendants, the "narrow" exception to the registration requirement under Section 411(a) of the Copyright Act, providing that "[e]xcept for an action brought for a violation of the rights of the author under section 106A(a)," only applies to "injunctive relief actions to *prevent* injury to artwork, not actions to recoup damages for allegedly injured copyright after the fact." (*Id.* at 9 (citing 17 U.S.C. § 411(a), §§ 106A(a)(3)(A))). However, Defendants have not pointed to any authority supporting this narrow reading of Section 411(a)'s exception as it applies to the VARA.

Section 411(a) is clear: "[A]ctions brought for a violation of the rights of the author under section 106A(a)" are excluded from Section 411(a)'s registration requirement. 17 U.S.C. § 411(a). Section 106A(a)(3)(A) provides that an author of a visual shall have the right to "*prevent* any intentional distortion, [or] mutilation" and that "any intentional distortion, [or] mutilation . . . *is a violation* of that right . . ." 17 U.S.C. § 106A(3)(A) (emphasis added). Thus, Section 106A permits authors of visual works of art to bring actions to prevent distortion or mutilation and actions for damages for the intentional distortion or mutilation of the visual work. Actions brought under Section 106A, as is the case here, do not require copyright registration. *See Cohen v. G & M Realty L.P.*, 988 F. Supp. 2d 212, 216 (E.D.N.Y. 2013) ("copyright registration is not required to bring a VARA infringement action, 'or to secure statutory damages and attorney's fees.'" (quoting *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995))).

///

5

### b. Exclusions under the VARA

#### i. "Applied Art"

Defendants argue that Plaintiff cannot state a claim for relief under the VARA because Plaintiff's works are "applied art" under the Ninth Circuit's test established in *Cheffins v. Stewart*, 825 F.3d 588 (9th Cir. 2016). (Mot. at 7-8.) Defendants contend that Plaintiff merely "placed artistic creations on tote bags" and "[t]hese tote bags did not 'cease' to have their utilitarian function as tote bags simply because of [Plaintiff's] claims of artistic merit." (*Id.* at 6.) In opposition, Plaintiff argues that the tote bags were a medium and "ceased serving any utilitarian function/master when they became one-of-a-kind rare art . . . ." (Opp. at 15.) According to Plaintiff "the question of whether the 88 unique works at issue in this case ceased to be art and were really utilitarian is, at best, a factual question." (*Id.* at 15.)

"The purpose of VARA is to protect two 'moral rights' of artists—the rights of 'integrity' and 'attribution.'" *Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*, 311 F.3d 979, 984 (9th Cir. 2002) (citing H.R. Rep. No. 101-154, at 5 (1990). "The right of integrity allows the artist to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." *Id.* (internal alterations omitted) (citation omitted). "The right of attribution allows the artist to be recognized by name as the creator of a work. It includes an artist's right to prevent the use of his or her name on distorted pieces of art originally produced by him or her." *Id.*

The VARA provides, in relevant part:

(a) Rights of attribution and integrity . . . . the author of a work of visual art—

. . .

(3) subject to the limitations set forth in section 113(d), shall have the right

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his

6

> or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, . . . .

17 U.S.C. § 106A(a)(3)(A).  The Copyright Act defines a "work of visual art" as: "(1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author. . . ."  17 U.S.C. § 101.  The Act also provides that a "work of visual art does not include" "any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, . . . or similar publication; [or] . . . any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container . . . ."  17 U.S.C. § 101.

In *Cheffins*, the issue before the Ninth Circuit was "whether the [VARA] applie[d] to a used school bus transformed into a mobile replica of a 16th-century Spanish galleon [("*La Contessa*")]."  825 F.3d at 592.  The case was before the Court after the district court's grant of summary judgment against the creators of the mobile replica because it concluded that the *La Contessa* was "applied art" under the VARA.  *Id.*  The Ninth Circuit, after noting that federal courts had rarely had occasion to interpret the meaning of "applied art" under the VARA, held that "an object constitutes a piece of 'applied art' –as opposed to a 'work of visual art'—where the object initially served a utilitarian function and the object continues to serve such a function after the artist made embellishments or alterations to it."  *Id.* at 594.  The Court went on to explain that "'applied art' would not include a piece of art whose function is purely aesthetic or a utilitarian object which is so transformed through the addition of artistic elements that its utilitarian functions cease."  *Id.*  The Ninth Circuit also explained: "[O]ur focus is on objects that *in fact* continue to serve real utilitarian functions (as opposed to those which may retain the ability to serve utilitarian functions, or those which at one point in history served such functions [ ].).  *Id.* at 594 n.7 (emphasis in original).

Based on the record before the Court, the Ninth Circuit concluded that the artists' chosen medium, a school bus, continued to *in fact* be used for its utilitarian function. *Id.* at 595. The *La Contessa* continued to be used for "transportation, providing rides to festival-goers, hosting musical performances and weddings, and serving as a stage for poetry and acrobatics shows." *Id.* There was also evidence that the *La Contessa* was at one point "banned from the [Burning Man] Festival [ ] because its unsafe driving practices far exceeded community tolerance and out-weighed the visual contribution it made." *Id.* The Ninth Circuit described the *La Contessa* as having "many artistic qualities" but, based on the undisputed evidence, held that it "retained a largely practical function . . . ."[1] *Id.*

Here, Plaintiff alleges that in 2018, the CAM began an exhibition in which he was "was one of the Asian American artists asked to showcase original art." (Compl. ¶ 14.) "[Plaintiff] created 88 original pieces of artwork to be shown at [the] exhibition." (*Id.* ¶ 15.) "[Plaintiff's] 88 art creations were placed on tote bags, which were to be hung outside CAM on clotheslines as performative art that echoed the experience of Chinese Americans in Los Angeles and as a whole looked like a series of red lanterns." (*Id.*) The Complaint includes photographs depicting Plaintiff's artwork hanging from clotheslines in the CAM courtyard. (*Id.* ¶ 16.) Plaintiff also argues that his art was not a "tote bag that continued to serve a 'significant utilitarian purpose' . . . rather, it served only the

---

[1] It is noteworthy that the Ninth Circuit was not concerned with whether the *La Contessa* retained the physical characteristics of a bus, such as a motor, tires, or the dimensions which made it look like a bus. Those characteristics, under Defendant's reading of *Cheffins*, would be sufficient to conclude that the *La Contessa* was applied art. (*See* Reply "[Plaintiff] has not asserted that the bags could not function as tote bags before or after the print was applied, nor have the tote bags lost their pre-application function after the print is applied. . . . [T]he photos show normal-looking tote bags decorated with a print.") Instead, the Ninth Circuit's analysis centered on whether the *La Contessa* "continue[d] to serve such a function"—not whether it could conceivably continue to serve such a function or whether the *La Contessa* looked like a bus. *Cheffins*, 825 F.3d at 594.

8

purpose of constituting an exhibited art work at a prestigious museum and, . . . it was to be sold as art to art collectors in limited edition . . . not as a grocery bag." (*Id.* at 10.) Plaintiff notes that his art was "part of a larger cultural art showcase for the public to celebrate the Chinese community" and Plaintiff "chose to display his art in this public performance manner to echo the experience of Chinese Americans in Los Angeles—the use of clothes lines and laundry clips hanging the art was reminiscent of Chinese laundry facilities that are part of the historical Chinese-American experience in the laundry trade . . . ." (*Id.* at 12-13.) The complaint, however, does not allege this information.

The plausible inference from the allegations and the photographs is that the objects were used as canvases with handles on which Plaintiff placed his work of art. The handles were simply used as a method of display. Plaintiff's choice of medium had the potential to be tote bags, but the utilitarian function appears to have never occurred or certainly ceased at the time the art was hung from the clotheslines at CAM—the objects were above the public in the museum's courtyard serving no function other than performative art. However, the court notes that there are no allegations clearly setting forth the nature of the objects before or after Plaintiff completed his creation.[2]

The court finds that, although the allegations are not deficient, in light of the extensive discussion at oral argument and the court's discussion of *Cheffins* above, it would be appropriate to amend the complaint in order to clarify the substance of the allegations. Further clarification on the nature of Plaintiff's work of art would focus future arguments by the parties. The focus, as articulated in *Cheffins*, is whether the objects—the tote bags—"*in fact* continue[d] to serve real utilitarian functions." *See*

---

[2] The complaint also does not set forth the precise nature of Plaintiff's art. For example, in the opposition, Plaintiff states that "[e]ach bag's art was individually painted by [Plaintiff] as a unique individualized version of each of the shark drawings by personal artistic touches of the artist." (Opp. at 19.) However, this information is not set forth in the complaint. (*See* Compl. ¶ 15.)

9

*Cheffins*, 825 F.3d at n.7. The fact that artists use various medium which all potentially can be reserviced at some future date or reverted to be used in a utilitarian function is immaterial. Many items are used as canvases. We must be cautious that the label we place on the object itself does not answer the question without doing the analysis. Great pieces of art have certainly been painted on wood. Even though the wood could theoretically be repurposed as a fence post or a door, no reasonable argument could be made that because of that "potential" the object ceases to be protectable as a work of visual art.

On amendment, Plaintiff is to focus the allegations on the nature of his alleged works of visual art and, importantly, whether the objects were in fact continued to serve a real utilitarian function.

### ii. "Merchandising items"

Defendants next argue that Plaintiff's art falls outside of the scope of the VARA as "merchandising items" based on a Vendor Application Form, a Form that is not part of the Complaint. (Mot. at 6.) Even if the Vendor Application Form is properly subject to judicial notice, at this stage the Form does not establish that Plaintiff's works of art were in fact "merchandising items" under the VARA. (*See* Dkt. 21-1, RJN, Ex. 1.) It appears that Defendants' argument is based on the premise that every item sold through its gift shop is inherently a merchandising item. The court does not agree. As alleged by Plaintiff, Plaintiff was "asked to showcase [his] original art" and his creations were "performative art" as part of an art exhibition. (Compl. ¶¶ 14, 15.) That Plaintiff's works of art were later to be sold through the museum's gift shop does not automatically convert the alleged art pieces into merchandising items. The court declines to dismiss based on the "merchandising items" exclusion under the VARA.

**B. Timeliness of the State Law Claims**

Defendants next move to dismiss Plaintiff's state law claims based on timeliness. Defendants argue that Plaintiff is barred from pursuing the state law causes of action

10

because Plaintiff failed to file suit within six months of the City's denial of Plaintiff's formal complaint to the City.  (Mot. at 9-10; RJN, Exs. 5, 6.)³  The City records show that the City denied Plaintiff's claim on June 14, 2019.  (Ex. 6.)  Plaintiff filed this action more than six months after the City's denial, on December 2, 2020.  (*See* dkt.)  Plaintiff avers in opposition to the motion that he can assert "estoppel, waiver and misrepresentation to that defense if pled by the City."  (Opp. at 21-22.)

The California Government Claims Act requires that suit be commenced against a public entity "not later than six months after the date such [denial notice] is personally delivered or deposited in the mail."  Cal. Gov't Code § 945.6(a)(1); *see also* § 913.  However,

> [a] public entity may be estopped from asserting the limitations of the tort claims statutes where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act.  The required elements for an equitable estoppel are: (1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct to his or her injury.

*J.J. v. Cty. of San Diego*, 223 Cal. App. 4th 1214, 1227 (2014), as modified on denial of reh'g (Mar. 7, 2014) (citations omitted); *see also Ovando v. City of Los Angeles*, 92 F. Supp. 2d

---

³ The court grants judicial notice of Exs. 5 and 6.  Courts "may take judicial notice of court filings and other matters of public record."  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006); *see also* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

1011, 1024 (C.D. Cal. 2000) ("A public entity may be estopped from asserting non-compliance with the [California's Government Claims Act] when affirmative acts of its agents, especially authority figures, deterred the filing of a timely claim."). "An estoppel defense is available in all circumstances where the government has acted in an unconscionable manner or attempted to take unfair advantage of the claimant. The issue is determined from the totality of the circumstances." *Ramirez v. Cty. of Los Angeles*, 397 F. Supp. 2d 1208, 1229 (C.D. Cal. 2005) (internal alterations and citations omitted).

As currently pled, Plaintiff's allegations are insufficient to plausibly allege estoppel against the City. The court grants Plaintiff leave to amend to sufficiently allege estoppel, including affirmative acts of City agents which deterred Plaintiff's timely filing of this action. Because the court dismisses for failure to allege compliance or estoppel, the court does not reach whether Plaintiff sufficiently alleged the state law causes of action against the City.

**C. California Art Preservation Act ("CAPA")**

Defendants next contend that Plaintiff's second and third causes of action under CAPA are preempted by VARA. (Mot. at 10.) Plaintiff argues that the VARA does not preempt CAPA because VARA only protects "destruction [that] is 'prejudicial to his or her honor or reputation.'" (Opp. at 17 (quoting 17 U.S.C. § 106A(a)(3)(A)&(B)). Whereas, according to Plaintiff, CAPA protects "damage to the property itself—irrespective of the honor/reputation injury to the artist . . . ." (*Id.*) Plaintiff further argues that if a jury were to find that Plaintiff's art is "applied art," it would fall outside of VARA, but would be eligible for protection under CAPA as a "work of fine art." (*Id.* at 18.)

Courts in the Ninth Circuit apply a two-part test to determine whether a state law is preempted by the Copyright Act. *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001); *Whalen v. United Food & Com. Workers Loc. 135*, No. 14-CV-3017 W BLM, 2015 WL 4659213, at *2 (S.D. Cal. Aug. 5, 2015). First, the court must determine whether "the 'subject matter' of

12

the state law claim falls within the subject matter of [federal copyright law]." *Laws*, 448 F.3d at 1137. Second, the court must determine "whether the rights asserted under state law are equivalent to the rights contained in [federal copyright law] . . . ." *Id.*

The court rejects Plaintiff's reading of the VARA. The VARA does not require a showing that the destruction of a work of visual art be prejudicial to an artists' honor or reputation. Rather, the VARA provides that "*any* intentional distortion, mutilation, or modification of [a work of visual art] is a violation of that right"—the right to prevent the destruction of a work of visual art that would be prejudicial to the artists' reputation or honor. 17 U.S.C. § 106A (emphasis added). In other words, by statute, the intentional destruction of a work of visual art is by definition prejudicial to the artists' honor or reputation. Thus, VARA preempts CAPA, whereas here, Plaintiff's claim under CAPA is based on the same right of integrity protected under the VARA. (*See* Compl. ¶ 28 (". . . in violation of [Plaintiff's] rights including his right of integrity therein, as set forth in Title 17, Section 106A(a)(3)(A) and Section 106A(a)(3)(B)"); ¶ 33 (". . . in violation of [Plaintiff's] rights including his right of integrity therein under Cal. Civil Code § 987."). *See Whalen*, 2015 WL 4659213, at *2; *Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*, 311 F.3d 979, 984 n.1 (9th Cir. 2002) (noting that "it appears that CAPA may have been preempted by VARA.") (citing *Lubner v. City of Los Angeles*, 45 Cal. App. 4th 525, 531 (1996)).

At this stage, the court finds that the parties have insufficiently briefed preemption as it relates whether Plaintiff's art could fall outside of the VARA as "applied art" but still be protected under CAPA as "fine art." *See* Cal. Civ. Code § 987(b)(2) ("'Fine art'" means an original painting, . . . of recognized quality, but shall not include work prepared under contract for commercial use by its purchaser."). In any event, Plaintiff has not sufficiently alleged that his work is an "original painting" as he argues in his opposition. Therefore, the court does not reach whether CAPA is preempted by the

13

VARA in such a case. The court grants Plaintiff leave to amend expressing no opinion as to the validity of such a claim.

**IV. CONCLUSION**

For the reasons set forth above, the court grants Defendants' motion. The court grants Plaintiff leave to amend. Any amendment must be filed within fourteen days from the date of this order.

**IT IS SO ORDERED.**

Dated: August 31, 2021

_____

DEAN D. PREGERSON

UNITED STATES DISTRICT JUDGE