O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEW, an individual, a/k/a SHARK TOOF, <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF LOS ANGELES, a government entity; EL PUEBLO DE LOS ANGELES, business form unknown; CHINESE AMERICAN MUSEUM, business form unknown; FRIENDS OF THE CHINESE AMERICAN MUSEUM, INC., a California corporation; and DOES 1 through 30, inclusive, <br><br> Defendants. | Case No. 2:20-cv-10948-DDP-PLA <br><br> **AMENDED ORDER RE: DEFENDANTS' MOTION TO DISMISS** <br><br> [Dkt. 43, 54] |

Presently before the court is Defendant the City of Los Angeles ("City") and Defendant Friends of the Chinese American Museum Inc. ("FCAM") (collectively, "Defendants")' Motion to Dismiss Plaintiff's First Amended Complaint ("FAC"). (Dkt.

43.) Having considered the parties submissions and heard oral argument, the court GRANTS the motion in part, and adopts the following order.

**I. BACKGROUND**

Plaintiff is "an internationally known professional artist and muralist of wide repute and reputation" also known as "Shark Toof." (FAC ¶ 11.) Plaintiff's "paintings as well as his outdoor murals have been featured around the world and his original artwork has been sought by a diverse range of clients (including famous rock stars among others), as well as displayed at art shows in museums across the country." (*Id.*) Defendants are the City of Los Angeles ("City"), El Pueblo de Los Angeles ("El Pueblo"), the Chinese American Museum ("CAM"), and Friends of the Chinese American Museum ("FCAM") (collectively, "Defendants"). (*Id.* ¶ 4, 5, 6, 7.)

Plaintiff alleges that in 2018, "CAM began to plan a multi-month exhibition called 'Don't Believe the Hype: LA Asian Americans in Hip Hop,' which examined resistance, refuge, and reinvention for Asian Americans living in the Los Angeles region through art, and had site-specific immersive spaces created by graffiti artists and muralists." (*Id.* ¶ 13.) CAM invited Plaintiff to "showcase original art at the exhibit." (*Id.* ¶ 14.)

Plaintiff "created 88 original pieces of artwork to be shown at CAM's exhibition." (*Id.* ¶ 15.) Plaintiff's "art creations were placed on canvas bags, which were to be hung outside the CAM building on City property on clotheslines as performative art that echoed the experience of Chinese Americans in Los Angeles and as a whole looked like a series of red lanterns." (*Id.*) Plaintiff named the exhibition of his artwork, Year of the Shark Red Packet." (*Id.*) Plaintiff further alleges that he "lent another larger piece to be exhibited indoors at the exhibition." (*Id.*)

With respect to the outdoor exhibition piece, Plaintiff alleges that each of the 88 works "were individually created by hand in a lengthy and painstaking individualized multi-step process[,]" including individually painted sharks and gold lettering. (*Id.* ¶ 16.) Plaintiff's "intended expectation and goal was that each already unique individual piece

would also then uniquely age/wear differently while hanging in the Museum courtyard, due to the weather, all to echo the idea of red Chinese lanterns on a clothes line" and "the experience of Chinese Americans in the historical laundry trade of his ancestors[,]" and "the vastly different, individualized, unique experience of all Chinese Americans . . . ." (*Id.*)  Plaintiff "chose the canvas bags . . . as a medium to create his art for the purpose of his unique artistic creations." (*Id.* ¶ 17.)

Plaintiff further alleges that "[a]t the express request of the Museum Curator, [Plaintiff] agreed to allow some of the pieces to be sold . . . to aid the Museum in its request to sell his art through the gift shop and also in part raise money for the Museum and help the Museum's patrons and Lew's collectors . . . get true one-of-a kind pieces of his art . . . ." (*Id.* ¶ 18.)  Plaintiff "also pre-sold some of the 88 works of art to art collectors . . . before the exhibit opened." (*Id.*)  According to Plaintiff, "[t]he Museum Curator told [him] that there was no way for the Museum itself to properly sell the art directly, and so it needed to do it through its gift shop."  Moreover, "[n]one were in fact sold by the Museum gift shop." (*Id.*)

On or about December 12, 2018, "[Defendants] collectively removed and unlawfully trashed the art without giving prior notice to [Plaintiff]," as Plaintiff alleges, "was customary in the art field." (*Id.* ¶ 20.)  Plaintiff alleges that Defendants knew that "his art was deeply important to him and imbued with personal meaning, as it reflected his lifetime of experiences, his heritage, and his values." (*Id.* ¶ 21.)  Plaintiff further alleges that Defendants were "aware of the meaning of the work to the broader public, including the Chinese American community." (*Id.*)  According to Plaintiff, Defendants "knew the art was to be preserved and returned to [Plaintiff]." (*Id.* ¶ 22.)  Plaintiff expressed "horror and shock" when he learned about Defendants' removal and subsequent destruction of his work in late December 2018. (*Id.* ¶ 24.)

Plaintiff alleges that the City's general manager Chris Espinosa, through El Pueblo, "admitted fault after the art had been destroyed. (*Id.*)  CAM's curator Justin

3

Hoover also admitted fault.  (*Id.*)  Plaintiff further alleges that Defendants have failed to return "14 of the 88 original pieces" that were "not destroyed."  (*Id.* ¶ 25.)  Plaintiff "filed a formal claim of property loss on or about March 15, 2019" with City and "also sought redress from CAM/FCAM via its purported insurance carrier."  (*Id.* ¶ 26.)  Plaintiff specifically alleges that after receiving a "June 2019 denial of his claim," Plaintiff's counsel "call[ed] to speak to the City employee who issued the denial of all claims . . . to understand how the City could deny the claim . . . ."  (*Id.* ¶ 27.)  In response, Plaintiff alleges that City's employee "stated that he denied the claim solely because he/the City had been told by the Museum that it had ample coverage" such that FCAM would pay Plaintiff from its insurance.  (*Id.*)  Plaintiff alleges that thereon, he "believed there was in fact insurance" based on "the availability of the FCAM museum insurance to pay him" and thus "did not . . . further pursue a suit against the City."  (*Id.*)  Plaintiff thereafter "asked FCAM on several occasions for copies of the insurance policies in effect."  (*Id.*)  However, Plaintiff alleges that FCAM neither responded nor provided access to the policies.  (*Id.*)  Plaintiff alleges that in 2019, "numerous emails and phone calls to FCAM officers and employees made over several months to reach an insurance resolution or see the policies went unresponded to."  (*Id.*)

      Plaintiff further alleges that "[a]fter months of delays by the FCAM and its insurance carrier," FCAM's insurance company offered "several thousand dollars" for the cost of materials and "valued the art at only $88.00 as of that time."  (*Id.* ¶ 28.)  Plaintiff thereafter "made a policy limits demand plus attorney's fees."  (*Id.*)  According to Plaintiff, "[a]fter further months of delay and pressure from [Plaintiff's] counsel to get to the negotiation table to resolve the claim, counsel for the carrier suddenly . . . said they were out of the matter and that there was no insurance coverage."  (*Id.*)  Plaintiff further alleges that his counsel "pressed to understand why they were withdrawing since the carrier's claims adjuster said a policy existed and that outside counsel were the ones for [Plaintiff] to talk to."  (*Id.*)

4

"[I]n August 2020, more than a year and a half after the loss, FCAM reversed its position that it had coverage and would pay." (*Id.*) Plaintiff alleges that instead, "[FCAM] said that it had no liability" and "to look to the City as solely responsible." (*Id.*) Plaintiff further alleges that "FCAM was . . . required under its MOU agreement with the City to carry liability insurance for the exhibitor losses . . . and at levels and by carriers approved by the City [ ], as well as D&O coverage [ ]." (*Id.* ¶ 30.) Plaintiff "believed at the time that there was insurance to protect him based on Defendants' "representations" and because, as Plaintiff alleges, "it is customary for artists who showcase their work at museums [that] carry insurance to protect the exhibitor art from loss/damage." (*Id.*)

Based on the allegations above, the FAC alleges the following federal and state causes of action against Defendants: (1) Violations of the Visual Artists Rights Act ("VARA") and Right of Integrity (17 U.S.C. § 106A); (2) Intentional Desecration of Fine Art (Cal. Civ. Code §§ 987(c)(1), (e)); (3) Grossly Negligent Desecration of Fine Art (Cal. Civ. Code §§ 987(c)(2), (e)); (4) Conversion; (5) Negligence; (6) Unfair, Unlawful Practices (Cal. Bus. & Prof. Code § 17200 *et seq.*); and (7) Fraud, Misrepresentation and Concealment.

Defendants presently move to dismiss the FAC in its entirety for failure to state a claim and lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1). (Dkt. 43, Mot.)

**II. LEGAL STANDARD**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-

5

unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Id.* at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id*. at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555, 556. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**III. DISCUSSION**

    **A.  Visual Artists Rights Act ("VARA")**

In the second iteration of their motion to dismiss, Defendants argue that this Court lacks subject matter jurisdiction over Plaintiff's VARA claim because Plaintiff's works are not "visual art," as defined under the Copyright Act. Instead, Defendants contend that Plaintiff's works fall within the definitions of specific categories excluded from VARA protection: (1) applied art, (2) merchandising items, and (3) promotional materials.

        i. <u>"Applied Art"</u>

As the court discussed in its prior order, VARA provides protection to authors of works of visual art. (Dkt. 39, Order at 5.) However, "applied art" is excluded from VARA protection under the Copyright Act. *See* 17 U.S.C. § 101 (providing that a "work of visual art does not include" any poster, map globe, chart, technical drawing, diagram, model, *applied art*, motion picture or other audiovisual work, . . ."). The Ninth Circuit in *Cheffins v. Stewart*, 825 F.3d 588 (9th Cir. 2016) determined that the focus of what constitutes applied art is whether an object is "utilitarian." Under the *Cheffins* test, an

6

object is applied art when "the object initially served a utilitarian function" and "the object continues to serve such a function after the artist made embellishments or alterations to it." *Id.* at 594. Conversely, the court stated that, "'applied art' would not include a piece of art whose function is purely aesthetic or a utilitarian object which is so transformed through the addition of artistic elements that its utilitarian functions cease." *Id.* The court elaborated that the test "embraces the circumstances both where a functional object incorporates a decorative design in its initial formulation, and where a functional object is decorated after manufacture but continues to serve a practical purpose." *Id.* The court also emphasized that in answering the "utilitarian function" question, the pertinent inquiry is not whether the object "*may* retain the ability to serve utilitarian functions," but rather, whether the object "*in fact* continue[s] to serve real utilitarian functions." *Id.* at 594 n.7.

Under the *Cheffins* test, the Ninth Circuit concluded that the *La Contessa*, a mobile replica of a 16th-century Spanish galleon, was applied art because it was built on top of an operational school bus. *Id.* at 595. Notwithstanding its "elaborate decorative elements" and "many artistic qualities," the *La Contessa* continued to serve a "largely practical function" after it was completed, because it was (in fact) still used as a mode of transportation. *Id.*

In applying the *Cheffins* test to this case, factual issues remain as to whether the underlying canvases used for each of Plaintiff's works initially served a utilitarian function and if so, whether they continued to serve a largely practical function after the works were complete. It appears that the latter question is largely dependent on the former. Unlike the school bus in *Cheffins*, the underlying objects for Plaintiff's art were not operational "tote bags," but rather canvases with handles. Plaintiff alleges that he "chose the canvas bags simply as the medium to create his art for the purpose of his unique artistic creations." (FAC ¶ 17.) Plaintiff further alleges that "[e]ven before [he] created his art they never served any utilitarian function as an actual tote bag." (FAC ¶

7

17.)  There are no facts to suggest the canvas bags initially served the utilitarian function of a quintessential "tote bag" for carrying or holding other objects.  That said, Defendants' argument that Plaintiff's works continued to serve a utilitarian function because the "decorated bags were to be sold at the museum gift shop" presupposes that Plaintiff's artwork functioned as "tote bags" rather than as canvases for his art.  To the extent Defendants have evidence to suggest that the initial canvases functioned as "tote bags" and continued to serve the "largely practical purpose" of a "tote bag" after Plaintiff made his artistic changes to them, they may do so on a motion for summary judgment.

Out of an abundance of caution, the court notes that an all-too-narrow reading of *Cheffins* would exclude a swath of visual art due to even the slightest of functional characteristics.  "When an artist is denied moral rights in his or her work, his or her creativity is implicitly stifled through nonrecognition."  Brandon J. Pakkebier, *Form Over Function: Remedying VARA's Exclusion of Visual Art with Functional Qualities*, 103 Iowa L. Rev. 1329, 1345 (2018).  Moreover, "if judges continue to interpret VARA as exclusive of functional items, then artists working in these fields of art may succumb to the pressures of the market and may lose their drive to continue creating solely for the purpose of creating, instead choosing to create art as a commissioned artist unprotected by VARA."  *Id.*  Such consequence "undermines the very goal [VARA] sought to implement: protection of artists working in the visual arts."  *Id.* at 1345-46 (citing H.R. Rep. No. 101—514, at 6 (1990), reprinted in 1990 U.S.C.C.A.N. 6915, 6916 (2018) ("If there exists the real possibility that the fruits of this effort will be destroyed after a mere ten to twenty years the incentive to excel is diminished and replaced with a purely profit motivation.  The [VARA] mitigates against this and . . . protects our historical legacy.")).

For these reasons, the court declines to find that Plaintiff's works constitute "applied art."

///

///

8

### ii. "Merchandising Items"

Defendants largely rely on the same argument the court flatly rejected in its prior order—namely that, Plaintiff's "tote bags" are "merchandising items," because Plaintiff "contracted with FCAM to market and sell his tote bags at the Museum as 'gift shop items.'" (Mot. at 10.) As the court noted, "[t]hat Plaintiff's works of art were later to be sold through the museum's gift shop does not automatically convert the alleged art pieces into merchandising items." (Order at 10.) The court adheres to its prior ruling and thus declines to relinquish jurisdiction on this ground.

### iii. "Promotional Materials"

Defendants next argue that Plaintiff's work falls outside the protections of VARA because they are "promotional materials." (Mot. at 10.) The VARA statute excludes "any merchandising item or advertising, promotional, descriptive, covering, packaging material or container" from protection. 17 U.S.C. § 101. Defendants cite to *Kleinman v. City of San Marcos*, 597 F.3d 323 (5th Cir. 2010), for the proposition that Plaintiff's "festive display of clotheslines with hung bags" were "outside the museum to promote and draw attention to the exhibition." (Mot. at 10.) However, *Kleinman* is distinguishable from the instant case. In *Kleinman*, Planet K had a tradition of celebrating new store openings with a charity event whereby the public paid for the privilege of sledgehammering a car to a "smashed wreck." 597 F.3d at 324. Upon the opening of its new store, the owner arranged to have a smashed car with various cacti and painted scenes of life positioned in front of the store. *Id.* The Fifth Circuit affirmed the district court's findings that the car-planters were "closely associated with Planet K," were "part of the store's corporate image and culture," and were "a distinctive symbol of the Planet K business." *Id.* at 329. These findings indicated that the car-planters were "promotional" material. *Id.*

In contrast to the facts in *Kleinman*, Plaintiff alleges that he was asked to "showcase" his "original art at the exhibit." (FAC ¶ 14.) Plaintiff does not allege that he was asked to create works symbolic of the museum or that reflected the museum's image

9

or culture.  Rather, Plaintiff's allegations suggest that his artwork was a component of the exhibit.  As such, the court finds that the "promotional materials" exclusion does not warrant dismissal.

### B. Timeliness of the State Law Claims

Next, Defendants argue that Plaintiff's state law claims should be dismissed because they are time-barred under the California Tort Claims Act ("CTCA").  (Mot. at 11.)  A government tort claim must be presented to the public entity no later than six months after the cause of action accrues.  Cal. Gov't Code § 911.2(a).  Here, there is no dispute that Plaintiff filed this action more than six months after the City denied his formal complaint, on December 2, 2020.[1]  Plaintiff argues, however, that he was estopped from filing a timely claim because one of City's employees informed him that the employee was advised by FCAM that there was an insurance policy to cover the loss.  (Opp. at 16; FAC ¶ 27.)

A claim of estoppel permits a public entity "from asserting the limitations of the tort claims statutes where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act." *J.J v. Cty. of San Diego*, 223 Cal. App. 4th 1214, 1227 (2014), as modified on denial of reh'g (Mar. 7, 2014) (citations omitted).  An estoppel claim requires the following: "(1) the party to be estopped must be apprised of the facts; (2) the party to be estopped must intend his or her conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) the other party must rely upon the conduct of his or her injury." *Id.*  Generally, "[a]n estoppel defense is available in all circumstances where the government has acted in an unconscionable

---

[1] As noted in the court's prior order, City's records showed that City denied Plaintiff's claim on June 14, 2019, nearly eighteen months before the filing of this action. (*See* Order at 11.)

10

manner or attempted to take unfair advantage of the claimant.  The issue is determined from the totality of the circumstances." *Ramirez v. Cty. of Los Angeles*, 397 F. Supp. 2d 1208, 1229 (C.D. Cal. 2005) (internal alterations and citations omitted).

Here, the allegations do not warrant application of equitable estoppel.  City's alleged representation that FCAM said it would cover the loss did not eliminate Plaintiff's independent duty to file a timely formal complaint as required under the CTCA.  The alleged facts do not suggest that either City or FCAM prevented or deterred Plaintiff from filing a formal claim on the basis that FCAM had insurance.  A defendant must act "above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Guerrero v.* Gates, 357 F.3d 911, 919 (9th Cir. 2004).  Here, Plaintiff's counsel called City to inquire about the reason for its denial of its formal claim.  City's agent told Plaintiff (rightly or wrongly) why his claim was denied.  Plaintiff does not allege that City's agent guaranteed that Plaintiff would receive coverage; only that Plaintiff should look to FCAM for coverage.  As such, Plaintiff is not excused from failing to timely file his formal claim. [2]

Accordingly, Plaintiff's fourth, fifth, sixth, and seventh causes of action are dismissed with respect to City.

///

---

[2] The court notes that Plaintiff's failure to comply with the filing requirement under the CTCA only warrants dismissal of claims not properly brought to City's attention.  However, Defendants have not developed an argument nor is there anything in the record to indicate that FCAM, a non-profit organization, is a local public entity within the meaning of the CTCA.  *See* Cal. Gov't Code § 900.4.  As such, Defendants' statute of limitations defense only applies to City.  In their Reply, Defendants argue for the first time that Plaintiff's state law claims against FCAM are insufficiently pled.  (*See* Reply at 17:5-18:8.)  However, "[i]t is well established that arguments raised for the first time in a reply brief are waived." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010).  The court accordingly does not consider Defendants' arguments regarding the sufficiency of Plaintiff's fourth, fifth, sixth, and seventh causes of action with respect to FCAM.

11

### C. California Art Preservation Act ("CAPA")

Defendants next move to dismiss Plaintiff's second and third causes of action on the basis that Plaintiff's CAPA clams are preempted by VARA. Specifically, Defendants argue that "[b]oth the subject matter (fine art) and corresponding rights (right of attribution and right of integrity) that CAPA seeks to protect are already addressed by VARA and the Copyright Act." (Mot. at 14.) In response, Plaintiff challenges Defendants' "complete preemption" theory and instead argues, that if a work is not covered by VARA, "it can still secure CAPA protection." (Opp. at 19-20.) Plaintiff further contends that because he "seeks remuneration for property rights losses," distinct from the right of integrity, his CAPA claims are not preempted. (*Id.* at 20.)

As noted in the court's prior order, the Ninth Circuit applies a two-part test to determine whether a state law is preempted by the Copyright Act. *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). The court first examines whether "the 'subject matter' of the state law claim falls within the subject matter of [federal copyright law]." *Laws*, 448 F.3d at 1137. The court then determines "whether the rights asserted under state law are equivalent to the rights contained in [federal copyright law]." *Id.*

The first part determines whether the work in question falls within the scope of VARA—that is, whether it is a "work of visual art." At this juncture, Plaintiff has sufficiently pled that his art is a work of visual art for purposes of this motion. Plaintiff sufficiently alleges that his works do not qualify as applied art, merchandising items, or promotional materials, and are therefore not excluded from VARA protection. As such, the first prong of the preemption test is satisfied.

Next, the court must determine whether the rights Plaintiff asserts are equivalent to the rights protected under VARA. The court concludes they are. With respect to VARA, the Act confers "moral rights" of artists—the rights of "integrity" and "attribution." *Cort v. St. Paul Marine Ins. Companies, Inc.*, 311 F.3d 979, 985-86 (9th Cir. 2002). The right of integrity allows the artist "to prevent any intentional distortion,

12

mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation . . . ." 17 U.S.C. § 106A.  Likewise, CAPA also protects the right of integrity as well as the artist's reputation.  *See* Cal. Civ. Code § 987 ("[T]he physical alteration or destruction of fine art . . . is detrimental to the artist's reputation, . . . there is also a public interest in preserving the integrity of cultural and artistic creations.").

Although Plaintiff contends that he seeks remuneration for property rights losses independent from moral rights, Plaintiff also seeks recovery for damages to his reputation.  (*See* FAC, Prayer for Relief.)  Moreover, Plaintiff alleges that Defendants have violated "his right of integrity."  (FAC ¶¶ 36, 40.)  Because Plaintiff's rights asserted under his CAPA claims fall squarely within the scope of VARA, the second prong is satisfied.

Accordingly, Plaintiff's CAPA claims are preempted by VARA.

**D.  Unfair Competition Law ("UCL")**

Next, Defendants argues that Plaintiff's sixth cause of action for unfair competition fails as a matter of law because City is a public entity and not a "person" within the meaning of California Business & Professions Code § 17200 *et seq*.  (Mot. at 17.)  Moreover, Defendants argue that because FCAM was "tasked by the City to run its museum, . . . FCAM also cannot be liable under [Plaintiff's] sixth cause of action."  (*Id.* at 18.)  Plaintiff, on the other hand, argues that because public entities are subject to liability under CAPA, by extension, the unfair competition law also applies to City.  (Opp. at 24.)

The UCL prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . and any act prohibited by Chapter 1 [ ] of the Business and Professions Code."  Bus. Prof. Code § 17200.  The UCL authorizes courts to enjoin "*[a]ny person* who engages, has engaged, or proposes to engage in unfair competition . . . ."  *Id.* § 17203.  The UCL defines "person" to include "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."  *Id.* § 17201.  California courts, however, have interpreted the

13

statute's narrow definition of "person" to mean that the legislature intentionally omitted government entities. *See, e.g, People for the Ethical Treatment of Animals v. Cal. Milk Products Advisory Bd.*, 125 Cal. App. 4th 871, 878-79 (2005); *Santa Monica Rent Control Bd. V. Bluvshtein*, 230 Cal. App.3d 308, 318 (1991) ("Appellant is a government agency; it is none of the things included in the [UCL's] definition of persons."); *Cnty. Of Sana Clara v. Astra U.S., Inc.*, 428 F. Supp. 2d 1029, 1034 (N.D. Cal. 2006) ("California courts have uniformly found that governmental agencies were not within the [ ] definition of 'person' in Section 17201[.]").

Plaintiff argues, however, that he is entitled to the additional UCL remedy because City is subject to liability under CAPA. (Opp. at 24.) Plaintiff cites to *Notrica v. State Compensation Ins. Fund*, 70 Cal. App. 4th 911 (1999) as illustrative of this principle. However, the court finds that case distinguishable. In *Notrica*, the court rejected the State Compensation Insurance Fund ("SCIF")'s argument that as a public entity, it was not a "person" subject to suit under the UCL because the California Insurance Code empowered SCIF to act as a private insurer and was subject to suit "in all actions arising out of any act or omission in connection with its business or affairs." *Id.* at 943-44. Therefore, under such circumstances, SCIF qualified as a person under section 17201.

Here, Plaintiff does not identify any provision of CAPA that specifically gives City the ability to act as a private entity. There is otherwise no dispute that City is a government entity. Thus, the court finds that City does not qualify as a "person" under section 17201. The same cannot be said with respect to FCAM. FCAM is a separate entity that is subject to suit for its own misconduct regardless of whether it is characterized as a "de facto partner" or "agent" of City. Because FCAM is a non-profit organization, it is subject to liability under the UCL statute.

As such, Plaintiff's UCL claim is dismissed as to Defendant City.

///

///

## IV. CONCLUSION

      For the reasons set forth above, Defendants' motion is GRANTED, in part, and DENIED, in part. Plaintiff's second and third causes of action are dismissed as to both Defendants, without leave to amend. Plaintiff's fourth, fifth, sixth, and seventh causes of action are dismissed as to City, without leave to amend.

**IT IS SO ORDERED.**

Dated: January 6, 2022

_____

          DEAN D. PREGERSON

     UNITED STATES DISTRICT JUDGE

15